# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 15, 2010

Charles R. Fulbruge III
Clerk

No. 09-30174

TERRANCE JONES,

> Petitioner – Appellee

v.

BURL CAIN, WARDEN, LOUISIANA STATE PENITENTIARY,

> Respondent – Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:06-CV-939

Before REAVLEY, CLEMENT, and SOUTHWICK, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Finding that a state court unreasonably applied clearly established federal law by holding that no Sixth Amendment violation occurred when a jury heard recorded testimony from a deceased witness to a murder, the district court granted the defendant's petition for a writ of habeas corpus. We affirm the grant of the writ but vacate the portion of the order requiring the State to dismiss the underlying indictment if it fails to retry the defendant within 120 days.

No. 09-30174

## FACTS AND PROCEEDINGS

### A.   Factual Background

In November 2001, a jury convicted Terrance Jones of second-degree murder for the shooting of Marty Martin in the early morning of July 28, 1997.[1] Pursuant to Louisiana's mandatory sentencing rules, the state trial court sentenced him to life in prison without the possibility of parole.

Responding to a call about a shooting, a Jefferson County Sheriff's Deputy discovered Martin's body in a blue Oldsmobile adjacent to James Artberry's house in Marrero, Louisiana.  Martin had been shot once in the chest.  EMS technicians who arrived soon after found that Martin had no vital signs.

Artberry told the police he had witnessed the shooting.  He gave a short statement at the scene, including a description of the perpetrator and the perpetrator's car.  Detective Mike Tucker then took him to the Criminal Investigations Bureau for questioning.  Artberry gave two recorded statements to Detective Tucker.  In the first, taken after 3:00 a.m., Artberry said that he had seen Martin at around 10:00 p.m. that night at a bar in Marrero.  He explained that Martin asked him to help find a prostitute, that he agreed to do so, but that the search was unsuccessful and the two returned to the bar.  Artberry said he walked home without Martin and later saw two black men in a Pontiac Grand Prix with tinted windows and a yellow sticker on the back window pull up in front of his house.  He claimed to have seen one of the two men shoot Martin over what appeared to be a drug deal gone wrong.  He stated that he did not get

---

[1] The underlying facts are laid out in more detail in *State v. Jones*, 841 So. 2d 965, 969-72 (La. Ct. App. 2003) (hereinafter "*Jones II*").

a good look at the shooter's face or the passenger in the shooter's car, and that he could not identify the shooter.

Artberry gave the second recorded statement shortly after 4:00 a.m. In it, he acknowledged his failure to disclose some information during the first statement, which he blamed on his fear of the shooter; he also explained that he had been involved in the drug deal. In this version of the story, after the unsuccessful search for a prostitute, Martin asked Artberry where he could get crack cocaine. Artberry took Martin to a woman who flagged down the blue Grand Prix and told the occupants that Martin wanted drugs. Martin and Artberry followed the Grand Prix in Martin's car and met its two black male passengers outside Artberry's house. Artberry stated that he saw Martin approach the passenger window of the Grand Prix, where he received a rock of crack cocaine and handed over some money. The passenger claimed that Martin had given him only a one-dollar bill instead of a twenty. Martin looked in his pockets and then went to his car and rummaged around inside it. At this point, the passenger in the Grand Prix told the driver to "knock his fucking head off." After looking at Artberry and telling him that he blamed Artberry for what had happened, the driver shot Martin twice. During this second interview, Artberry identified the shooter as a black man named Terrance who lived on Poe Street in Westwego. Artberry claimed to have known Terrance for several years.

Subsequently, the police composed a photo lineup based on this information. Artberry did not identify any of the subjects as the shooter. When presented with a second lineup containing a picture of Jones, however, Artberry

No. 09-30174

picked him out as the shooter.  After this identification, two detectives recorded a third interview with Artberry at his home.[2]

Artberry testified at a suppression hearing before Jones's first trial.  He stated that he had been able to identify the perpetrator in a photo lineup and that the perpetrator was named "Terrance."  He identified Jones in court as the same person he had identified in the lineup.  Jones's counsel cross-examined Artberry about these statements but not about the recorded statements he had given the police; Jones's defense counsel did not learn that the recorded statements existed until after the first trial had begun.  Shortly after the suppression hearing, and before the first trial, Artberry died of a drug overdose.

## B.    Procedural Background

### 1.    *First trial, mistrial, and state appeals*

Jones's first trial began in July 2000.  Before the trial, he moved to exclude Artberry's suppression hearing testimony.  The trial court denied the motion. The state intermediate appellate court and supreme court affirmed the denial. *State v. Jones*, 766 So. 2d 1261 (La. 2000) (table); *see State v. Jones*, 791 So. 2d 622, 624 (La. 2001) (hereinafter "*Jones I*").  During its direct examination of Detective Tucker, the State sought to introduce Artberry's first two recorded statements.  This was the first time that Jones's defense counsel learned of their existence.  Defense counsel objected and moved for a mistrial.  The trial court reversed its pretrial suppression ruling and granted the motion.  The state intermediate appellate court affirmed.  It held that, in light of the undisclosed

---

[2]  The third recorded statement was also played to the jury at Jones's trial, but the record does not contain a transcript of it.

statements, the defense had not had an opportunity to fully and effectively cross-examine Artberry at the suppression hearing. *See Jones I*, 791 So. 2d at 624.

The Louisiana Supreme Court reversed. Though it noted "substantial discrepancies between Artberry's second statement to Detective Tucker and his testimony at the suppression hearing," the court held that Jones had a fair opportunity to cross-examine Artberry at the suppression hearing and that Artberry's hearing testimony satisfied Louisiana's hearsay exception for prior recorded testimony. *Id.* at 626-28. It remanded the case for retrial.

### 2.    *Second trial and state appeals*

Jones's second trial began in November 2001. The prosecutor's opening statement included a narrative of the crime that relied on the recorded statements Artberry gave to the police. The prosecutor also told the jury that Artberry made two statements while at the police station—one in which he denied knowing who the shooter was, and a second in which he claimed he could identify the shooter. Jones's defense counsel, in his opening statement, suggested that Martin was killed after quarreling with Artberry and that Artberry changed his story when he realized he was a suspect.

In accordance with the state supreme court's ruling, the State introduced Artberry's cross-examined testimony from the suppression hearing without objection during its case-in-chief. The State again called Detective Tucker as a witness. Tucker testified that he had taken three statements from Artberry on the night of the murder and then began to testify about what Artberry had told him. He related the substance of the first recorded statement—the one in which Artberry said that he could not identify the shooter—without objection. When Tucker began to testify about what Artberry told him during the second recorded

No. 09-30174

statement—the one inculpating Jones—defense counsel objected on hearsay grounds. The trial court overruled the objection, explaining that Tucker could testify about Artberry's statements "for purposes of him relating . . . how he conducted his investigation." Jones's counsel, citing the un-cross-examined nature of the hearsay statements, moved for a mistrial. The trial court denied the motion and allowed the State to continue its examination of Tucker. It did not give a limiting instruction.

The State then moved to introduce transcribed copies of Artberry's statements and play the recordings to the jury.[3] Jones's counsel again objected on hearsay and Confrontation Clause grounds. The State argued that the Louisiana Supreme Court decision on the suppression hearing allowed the introduction of the recorded statements. It also argued that the statements should be allowed into evidence to bolster Artberry's credibility. The trial court admitted the evidence. The State made use of the statements during the remainder of its case-in-chief. It asked Tucker to explain his theory of the crime based in part on Artberry's statements, and Tucker's response relied almost

---

[3] The district court opinion summarizes the proceedings surrounding the admission of the recorded statements. *See Jones v. Cain*, 601 F. Supp. 2d 769, 778-82 (E.D. La. 2009) (hereinafter *"Jones III"*).

exclusively on the recorded statements.[4]  The jury convicted Jones of second-degree murder.

After he was found guilty and sentenced, Jones appealed to the state intermediate appellate court.  That court recognized that "the State primarily used the recorded statements to bolster its case against defendant."  *Jones II*, 841 So. 2d at 975.  It rejected the two main rationales advanced at trial for admitting the evidence: first, that the evidence could come in as part of Tucker's explanation of how he investigated the crime, *id*. at 974, and second, that the state supreme court's decision about the suppression hearing testimony also allowed the introduction of the recorded statements, *id*. at 975.

The appellate court held, however, that the recorded statements could be admitted, pursuant to Louisiana Code of Evidence article 801(D)(1)(b), "as consistent statements intended to rebut an express or implied charge against [Artberry] of recent fabrication or improper influence or motive." *Id*. (alteration in original) (quotation omitted).  Attacks on Artberry's motivations and credibility in defense counsel's opening statement and throughout the trial, the court reasoned, "allowed the State to use Artberry's prior recorded statements

---

[4] Other witnesses for the State provided circumstantial evidence against Jones.  Mary Gums, Jones's girlfriend at the time of the shooting, testified that Jones telephoned her after the murder and asked her to give his lawyer's phone number to a witness who lived next door to the murder scene—*viz*., to Artberry.  She did so; she later contacted Artberry and put him in touch with Jones.  Gums also stated that she asked Jones whether he had killed anybody, and that he responded by saying "Don't ask . . . no questions."  Gelandra Brue, whose credibility as a witness was highly questionable, *see Jones III*, F. Supp. 2d at 807 n.29, testified that Martin came to her house looking to buy crack on the night of the murder, but that she turned him away.  After Martin returned to her house with Artberry, she stated, she saw Jones pull up in a blue Grand Prix with another individual, saw Jones and Artberry speak for about ten minutes, and saw Martin and Artberry drive in the direction of Artberry's house, followed by the Grand Prix.  Only Artberry's recorded statements identified Jones as a drug dealer or provided a motive for the crime.

No. 09-30174

as a rehabilitative measure." *Id.* at 976. Louisiana Code of Evidence article 801(D)(1)(b) exempts as non-hearsay a prior statement by a declarant when "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . [c]onsistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." The state appellate court did not address the article's requirement that the declarant "testif[y] at the trial or hearing"—i.e., at the trial itself—where the declarant would be "subject to cross-examination concerning the statement." The Louisiana Supreme Court affirmed without a written opinion. *State v. Jones*, 854 So. 2d 345 (La. 2003) (table).

### 3. *Habeas proceedings*

Jones's state application for post-conviction relief was denied at each level. After exhausting his state post-conviction remedies, he filed a *pro se* § 2254 habeas corpus petition in the Eastern District of Louisiana.[5] In a lengthy ruling, the district court concluded that the state trial court admitted and used Artberry's statements for their truth, which implicated Jones's Sixth Amendment rights and triggered a Confrontation Clause analysis under *Ohio v. Roberts*, 448 U.S. 56 (1980), the clearly established law in place at the time of the relevant state court decision.[6] *Jones III*, 601 F. Supp. 2d at 787-88, 804-06; *see Whorton v. Bockting*, 549 U.S. 406, 416 (2007) (holding that *Crawford v.*

---

[5] After granting habeas relief, the district court appointed the Federal Public Defender to represent Jones on appeal to this court.

[6] The Confrontation Clause benefits Jones, a state defendant, because the Sixth Amendment is incorporated against the states through the Fourteenth Amendment. *See, e.g.*, *Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir. 1999).

8

No. 09-30174

*Washington*, 541 U.S. 36 (2004), did not announce a "watershed rule" of criminal procedure such that it could be applied retroactively). The district court concluded that the admission of the recorded statements did not bear adequate indicia of reliability under *Roberts* and did not fall within a "firmly rooted hearsay exception." *Jones III*, 601 F. Supp. 2d at 805-06; *see Roberts*, 448 U.S. at 66. It further concluded that the admission of the statements was not harmless error. *Jones III*, 601 F. Supp. 2d at 806-08. It set aside Jones's conviction and sentence and ordered the State to either retry Jones within 120 days or dismiss the indictment against him. *Id*. at 809.

The State appealed. It argues that the district court erred by reviewing the state appellate court's application of state evidence law; that the admission of the statements did not violate Jones's Confrontation Clause rights; and that any ensuing error was harmless. The State also argues that the district court lacked authority to order the dismissal of the indictment against Jones if the State fails to retry him within 120 days.

## STANDARD OF REVIEW

In a habeas appeal, this court reviews the district court's findings of fact for clear error and its conclusions of law *de novo*, applying the same standard of review that the district court applied to the state court decision. *Geiger v. Cain*, 540 F.3d 303, 307 (5th Cir. 2008). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governed the district court's review of Jones's petition. Under AEDPA, when a federal habeas petitioner's claim has been adjudicated on the merits in a state proceeding, a federal court must defer to the state court's decision unless its adjudication of the claim:

No. 09-30174

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Rogers v. Quarterman*, 555 F.3d 483, 488 (5th Cir. 2009).

"A state court's decision is contrary to clearly established federal law if it applies a rule that contradicts the governing law set forth in Supreme Court cases," *Fields v. Thaler*, 588 F.3d 270, 273 (5th Cir. 2009) (quotation omitted), or if the state court "decide[s] a case differently than the United States Supreme Court previously decided a case on a set of nearly identical facts," *Taylor v. Cain*, 545 F.3d 327, 334 (5th Cir. 2008).[7]    When applying the "unreasonable application" clause, "a court may grant habeas relief if the state court misapplied the relevant legal principles to the facts." *Taylor*, 545 F.3d at 334. Because no United States Supreme Court case has facts nearly identical to those before us, Jones's appeal is governed by AEDPA's "unreasonable application" prong. *See id.* "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

---

[7] Here, state habeas relief was denied without a written opinion. But, because we review only "the reasonableness of the state court's ultimate decision, the AEDPA inquiry is not altered when, as in this case, state habeas relief is denied without an opinion." *Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003). In this situation, the court "(1) assumes that the state court applied the proper 'clearly established Federal law'; and (2) then determines whether its decision was 'contrary to' or 'an objectively unreasonable application of' that law." *Id.*

No. 09-30174

**DISCUSSION**

**A.    Whether the district court erred by reviewing a state evidentiary ruling**

The State argues that the district court went beyond the permissible scope of federal habeas review by finding, contrary to the Louisiana courts, that Artberry's statements were hearsay.  The State contends that the district court should have deferred to the state courts' evidentiary rulings.

The State is correct that federal courts sitting in habeas do not review state courts' application of state evidence law.  *See Castillo v. Johnson*, 141 F.3d 218, 222 (5th Cir. 1998); *Mercado v. Massey*, 536 F.2d 107, 108 (5th Cir. 1976).  Here, though, the district court made clear that it was not reviewing the state evidentiary rulings themselves.  *Jones III*, 601 F. Supp. 2d at 787.  Instead, it correctly asked whether the state court's application of state evidence rules violated Jones's constitutional rights.  Regardless of how a state court applies state evidence rules, a federal habeas court has an independent duty to determine whether that application violates the Constitution.  *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *see also Slovik v. Yates*, 556 F.3d 747, 755 (9th Cir. 2009) (holding that a state court's decision based on state evidence law was nonetheless an objectively unreasonable application of federal law); *Fratta v. Quarterman*, 536 F.3d 485, 502 (5th Cir. 2008) ("[T]he fact that the statements were admissible under a state-law hearsay exception . . . did not dispose of the Confrontation Clause issue . . . .").

Adoption of the State's argument would immunize constitutional error from review when the error is related, however incidentally, to a state evidentiary ruling.  That is not the law.  "[T]he admissibility vel non of the evidence under state law is not determinative of a federally protected right

11

cognizable on habeas corpus." *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir. 1976) (quotation omitted); *see also Paxton v. Ward*, 199 F.3d 1197, 1208 (10th Cir. 1999). The district court did not err by ruling on the Confrontation Clause issue raised by the state trial court's application of Louisiana evidence law.

**B.    Whether the admission of the recorded statements violated Jones's 6th Amendment rights under *Ohio v. Roberts***

The State argues that Artberry's recorded statements were properly admitted as non-hearsay pursuant to Louisiana Code of Evidence article 801(D)(1)(b). It also claims that the Louisiana Supreme Court decision holding that Artberry's cross-examined suppression hearing testimony was admissible also authorized the admission of the un-cross-examined recorded statements. For the reasons explained below, both arguments fail. The district court correctly found all the elements of a Confrontation Clause violation under the applicable *Ohio v. Roberts* standard.

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The confrontation right is only implicated when the out-of-court statement is used to prove the truth of the matter asserted. *Tennessee v. Street*, 471 U.S. 409, 414 (1985). Before *Crawford v. Washington*, 541 U.S. 36 (2004), the Confrontation Clause barred the use of an absent declarant's out-of-court, un-cross-examined hearsay statements, with certain exceptions discussed below. Under the pre-*Crawford* regime applicable here, the Clause allows the use of testimony from unavailable witnesses that is "marked with such trustworthiness that there is no material departure from the reason of the general [Confrontation Clause] rule." *Roberts*, 448 U.S. at 65 (quotation omitted).

No. 09-30174

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Id.* at 66. Artberry was an unavailable declarant who gave testimonial evidence but was not present for cross-examination at trial. The questions before the court, then, are: (1) whether the recorded statements were used to prove the truth of the matters they asserted; and (2) whether they bear the requisite indicia of reliability, including whether they fall within a "firmly rooted hearsay exception."[8]

The district court correctly found that Artberry's statements were used to prove the truth of what they asserted, as did the Louisiana Court of Appeal, which recognized that "[i]t appears the State primarily used the recorded statements to bolster its case against [the] defendant." *Jones II*, 841 So. 2d at 975. The substance of Artberry's statements was related through Detective Tucker, and then the statements themselves were played to the jury. The second statement included a detailed description of the events leading up to the shooting. That description included, most notably, Artberry's assertion that Martin was shot for giving Jones and his accomplice a one-dollar bill rather than a twenty-dollar bill for a rock of crack cocaine, and that he was shot while searching for the twenty-dollar bill in his car—even after he had returned the

---

[8] Additionally, if the constitutional error is harmless, the habeas petition must be denied. *See O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). As explained *infra*, the State waived this argument.

13

No. 09-30174

crack. Artberry had not described the drug deal, the dispute over the money, or the details of the shooting during his suppression hearing testimony.

The jury was never instructed to ignore the statements as testimony of how the crime occurred and to consider them only for non-hearsay purposes. *Jones III*, 601 F. Supp. 2d at 800. Without an instruction to the contrary, the court cannot assume that the jury will not misuse the statements by considering them for more than their purported non-hearsay purpose. *United States v. Walker*, 148 F.3d 518, 524-25 (5th Cir. 1998), *abrogated on other grounds by Texas v. Cobb*, 532 U.S. 162 (2001).[9]

Most importantly, the prosecution's use of the statements was not limited to the putative purpose of shoring up Artberry's credibility, or indeed to any of the justifications given at trial for their admission. After the trial court held that the statements were admissible to show how Detective Tucker performed his investigation and formulated his theory of the crime—a use that, the state appellate court held, impermissibly raised the significant possibility that "'the jury [would] consider the statement for the truth of the matter asserted'"—Detective Tucker relied on the substance of the statements to explain his theory of the crime.[10] *Jones II*, 841 So. 2d at 974 (quoting *State v. Broadway*,

---

[9] Although the defense did not request a limiting instruction, it is likely that any such instruction would have been futile given that the statements bore directly on Jones's culpability and were only marginally relevant—if at all—to any purported non-hearsay purpose. Even if the statements were admissible under Louisiana article 801(D)(1)(b), their asserted credibility-bolstering value was substantially outweighed by the danger of unfair prejudice. It is difficult to imagine a limiting instruction that could cure such prejudice.

[10] Specifically, Tucker testified that his theory of how the shooting took place was that, "[w]hile reaching into his vehicle to retrieve the twenty-dollar bill, the victim was shot with his arm extended."

No. 09-30174

753 So. 2d 801, 809 (La. 2000)). Thus, Artberry's statements were used for their truth to put before the jury a narrative of the crime that was otherwise absent.

If a jury is asked to infer that a statement purportedly introduced for non-hearsay purposes also serves as proof of what it contains, then "the evidence would have been hearsay; and because [the declarant] was not available for cross-examination, Confrontation Clause concerns would have been implicated." *Street*, 471 U.S. at 414. Here, the combination of the playing of the recordings, Tucker's testimony about Artberry's statements during the early morning interviews, and Tucker's later reliance on the statements to explain his understanding of exactly how the shooting occurred, shows that Artberry's hearsay statements were admitted and used for their truth. *See Jones III*, 601 F. Supp. 2d at 804; *see also Taylor v. Cain*, 545 F.3d 327, 335 (5th Cir. 2008) ("Police officers cannot, through their trial testimony, refer to the substance of statements given to them by nontestifying witnesses in the course of their investigation, when those statements inculpate the defendant.").

The state court failed to consider the Confrontation Clause implications of the use of Artberry's testimony. That lapse would not have been constitutional error if the testimony bore "particularized guarantees of trustworthiness" or if it fell "within a firmly rooted hearsay exception." *Roberts*, 448 U.S. at 66. Because it did neither, the use of Artberry's testimony violated Jones's Sixth Amendment right to confront the witnesses against him.

"[A] finding of particularized guarantees of trustworthiness must be shown from the totality of the circumstances that surround the making of the statement, and may not be based on other evidence at trial that may corroborate the statement." *Fratta v. Quarterman*, 536 F.3d 485, 505 (5th Cir. 2008).

15

No. 09-30174

Artberry gave conflicting statements while being questioned at a police station in the early morning hours after a drug-related shooting. By his own admission, he had been with the victim until the shooting, which occurred after he had helped the victim locate crack cocaine. The shooting occurred adjacent to Artberry's property, and Artberry was found near the scene of the crime just afterwards. Additionally, Artberry gave two conflicting statements, both of which exculpated him of any wrongdoing. Where "the declarant makes accusatory statements that inculpate another" to non-undercover police personnel after a crime, "there always exists the strong possibility that the declarant has the desire to shift or spread blame, curry favor, avenge himself, or divert attention to another." *United States v. Flores*, 985 F.2d 770, 780 (5th Cir. 1993) (quotation omitted). Nothing about the facts surrounding James's recorded statements suggests, let alone establishes, a particularized guarantee of trustworthiness.

Second, as the district court correctly decided, Louisiana Code of Evidence article 801(D)(1)(b) is not a firmly rooted hearsay exception. Whether a hearsay exception is firmly rooted for the purposes of a Confrontation Clause analysis is a question of federal, not state, law. *Lilly v. Virginia*, 527 U.S. 116, 125 (1999). A hearsay exception is firmly rooted if, "in light of longstanding judicial and legislative experience, it rest[s] [on] such [a] solid foundatio[n] that admission of virtually any evidence within [it] comports with the substance of the constitutional protection." *Id.* at 126 (alterations in original) (quotations omitted). Conditions that have proved, over time, "to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the

No. 09-30174

obligation of an oath and cross-examination at trial," are firmly rooted. *Id.* (quotation omitted).

The question whether a prior consistent statement is a firmly rooted hearsay exception arises rarely, if ever: in the typical case in which such evidence is introduced, the declarant is on the stand and his prior consistent statement, about which he can be cross-examined, comes in as a hearsay exemption. We hold that, even if a prior consistent statement were normally considered to be imbued with the same trustworthiness as hearsay admitted under other firmly rooted exceptions, the rule as applied in Louisiana would not qualify. In *Tome v. United States*, the Supreme Court held that, under the Federal Rules of Evidence, a prior consistent statement used to rebut a charge of improper motive must have been made before the improper motive allegedly arose.[11] 513 U.S. 150, 160 (1995). The pre-motive requirement, it explained, was "[t]he prevailing common-law rule for more than a century before adoption of the Federal Rules of Evidence." *Id.* at 156. Louisiana's prior consistent statement rule has no such requirement. For Louisiana article 801 to be eligible as a firmly rooted hearsay exception, it cannot contravene more than 100 years of common law evidence practice.

Thus, the state trial court allowed the State to use the un-cross-examined, testimonial statements of an absent party for their truth against Jones. The statements were not marked by particularized guarantees of trustworthiness and did not fall under a firmly rooted hearsay exception. Under *Roberts*, the admission of the recorded statements violated Jones's clearly established Sixth Amendment right to confront the witnesses against him. Moreover, the

---

[11] Here, by contrast, all of Jones's statements were made after a motive to lie arose.

17

Louisiana courts' failure to recognize the violation was objectively unreasonable. This is not a close case. The violation of Jones's rights at trial should have been obvious, and the failure to correct it was unreasonable even under the deferential § 2254(d) standard. *Cf. Taylor*, 545 F.3d at 335-36 (holding that the state court unreasonably applied *Ohio v. Roberts*); *Dorchy v. Jones*, 398 F.3d 783, 788-91 (6th Cir. 2005) (same); *Murillo v. Frank*, 402 F.3d 786, 792 (7th Cir. 2005) (affirming grant of habeas and holding that "[a] statement, made during interrogation and blaming someone else, . . . is too unreliable to supply the 'particularized guarantees of trustworthiness' that until *Crawford* could have supported admissibility."); *Guidry v. Dretke*, 397 F.3d 306, 329-30 (5th Cir. 2005) (affirming a grant of habeas based in part on a Confrontation Clause violation under *Ohio v. Roberts*).

The State's remaining arguments that the admission of the statements was nonetheless proper are unavailing. It first contends that the decision of the Louisiana Supreme Court allowing the admission of Artberry's suppression hearing testimony also allowed the admission of Artberry's recorded statements. This argument has been rejected by each court that has considered it, and for good reason. *Jones III*, 601 F. Supp. 2d at 790; *Jones II*, 841 So. 2d at 975 ("[T]here is nothing in the [state supreme court's] opinion that can be reasonably interpreted as sanctioning the use of the recorded statements by the State as direct evidence."). The Louisiana Supreme Court came to no such conclusion. It noted in passing that Jones's defense counsel, when cross-examining Artberry during the suppression hearing, "uncovered the gist of Artberry's second undisclosed statement." *Jones I*, 791 So. 2d at 627. This, of course, does not mean that Artberry was cross-examined about the statement. While the state

No. 09-30174

supreme court also explained that, pursuant to Louisiana Code of Evidence article 806, the defense could introduce Artberry's statements to undercut the reliability of Artberry's suppression hearing testimony, *id.* at 628, at no point did it hold, or even imply, that the State could use the recorded statements against Jones in its case-in-chief.

The State brings two additional challenges to the grant of habeas relief. First, it asserts that, regardless of whether their admission would otherwise violate Jones's Confrontation Clause right, Artberry's statements were properly admitted because Jones's counsel invited the error. Second, the State contends that the admission was harmless error. The State waived both arguments by failing to raise them before the district court.

"The doctrine of invited error provides that when injection of inadmissible evidence is attributable to the actions of the defense, the defense cannot later object to such invited error." *United States v. Green*, 272 F.3d 748, 754 (5th Cir. 2001) (quotation omitted); *see also United States v. Sharpe*, 996 F.2d 125, 129 (6th Cir. 1993). The State waived this argument by failing to raise it in its merits opposition to Jones's petition in the district court. The district court's opinion includes a footnote explaining the difference between "opening the door" to the admission of otherwise irrelevant evidence and "invited error." *Jones III*, 601 F. Supp. 2d at 799 n.21. The district court did not rule on an invited error argument, however, because the State failed to make one. "[I]f a litigant desires to preserve an argument for appeal, the litigant must press and not merely intimate the argument during the proceedings before the district court." *FDIC v. Mijalis*, 15 F.3d 1314, 1327 (5th Cir. 1994).

No. 09-30174

Finally, the State argues that any Confrontation Clause violation was harmless because the evidence against Jones was strong and because the admission of the statements did not add significantly to the state's case. "On habeas review under AEDPA, the prejudice of constitutional error in a state-court criminal trial is measured by the 'substantial and injurious effect [or influence in determining the jury's verdict]' standard of *Brecht v. Abrahamson*," 507 U.S. 619 (1993). *Taylor v. Cain*, 545 F.3d 327, 336 (2008). When a court is "in virtual equipoise as to the harmlessness of the error under the *Brecht* standard, the court should treat the error . . . as if it affected the verdict." *Fry v. Pliler*, 551 U.S. 112, 121 n.3 (2007) (omission in original) (quotation omitted); *see also Woods v. Johnson*, 75 F.3d 1017, 1026-27 (5th Cir. 1996). An error is harmless, however, when the evidence of the defendant's guilt is overwhelming. *Taylor*, 545 F.3d at 336. The state bears the burden of showing that the error was harmless. *See Fry*, 551 U.S. at 121 n.3.

The district court found that the State waived the harmless error argument. The State did not raise harmless error in its response to Jones's *pro se* habeas petition. It brought up the issue only in a surreply, to counter a separate argument by Jones that is not before this court. Arguments raised for the first time in a reply brief are generally waived. *See United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005); *Iteld, Bernstein & Assocs., LLC v. Hanover Ins. Group*, Slip Copy, 2009 WL 2496552, at *4 (E.D. La. Aug. 12, 2009) ("[A]rguments raised for the first time in a Reply brief are waived."). This court can, in its discretion, consider the harmless error defense *sua sponte*. *United*

No. 09-30174

*States v. Vontsteen*, 950 F.2d 1086, 1091-92 (5th Cir. 1992).[12]   Because we are convinced that the error here was not harmless, we will not indulge the opportunity to undertake a full analysis in light of the State's waiver.

**C.  Whether the district court erred by ordering a conditional dismissal of the indictment**

The last question is whether the district court erred by ordering the State to dismiss the indictment if it fails to retry Jones within 120 days.[13]   The State is correct that the portion of the order requiring the dismissal of the indictment against Jones, rather than requiring him to be set free, is unusual.  We conclude that it constitutes an abuse of discretion.  *See Capps v. Sullivan*, 13 F.3d 350, 352 (10th Cir. 1993) ("In the typical case, we review the form of judgment entered by the district court for an abuse of discretion.").

In federal habeas cases, district courts have "broad discretion in conditioning a judgment granting habeas relief." *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987). "Federal courts are authorized, under 28 U.S.C. § 2243, to dispose of habeas corpus matters as law and justice require." *Id.* (quotation omitted).  The typical remedy in habeas corpus is physical release.  "Habeas exists 'to enforce the right of personal liberty; when that right is denied and a person is confined, the federal court has the power to release him.  Indeed, it has no other power; . . . *it can only act on the body of the petitioner.*'" *Zalawadia v.*

---

[12] The *Vonsteen* court cited *United States v. Giovannetti*, 928 F.2d 225 (7th Cir. 1991), for the proposition that the appellate court "ordinarily ha[s] the discretion to decide legal issues that are not timely raised." 950 F.2d at 1091. The *Giovannetti* case concluded that the court had discretion to overlook the government's failure to argue harmless error and undertake a *sua sponte* analysis. 928 F.2d at 227.

[13] This court stayed the district court's judgment in an order dated June 5, 2009, before the 120 days had run.

*Ashcroft*, 371 F.3d 292, 299 (5th Cir. 2004) (omission in original) (quoting *Fay v. Noia*, 372 U.S. 391, 430-31 (1963)); *see also Carson v. Johnson*, 112 F.3d 818, 820 (5th Cir. 1997) ("A habeas petition . . . is the proper vehicle to seek release from custody."). The physical release required by the writ, however, is not necessarily unconditional. Courts generally allow for the release of a prisoner subject to the state's right to detain him on the underlying indictment. Thus, in *Irvin v. Dowd*, the Supreme Court granted habeas relief but noted that the "petitioner is still subject to custody under the indictment filed by the State . . . and may be tried on this or another indictment." 366 U.S. 717, 728 (1961); *see also Chessman v. Teets*, 354 U.S. 156, 166 (1957) ("We . . . remand the case to the District Court, with instructions to enter such orders as may be appropriate to allow California a reasonable time within which to take further proceedings not inconsistent with this opinion, failing which the petitioner shall be discharged.").

An order conditionally dismissing the underlying indictment is warranted only in narrow circumstances. Because the habeas court can act solely on the body of the prisoner, it ordinarily lacks the power to order the dismissal of an indictment. Even when the state fails to retry a defendant within the time set by a habeas court so that the writ issues, freeing the defendant, the state is generally free to re-arrest and retry the defendant on the original indictment. *See Moore v. Zant*, 972 F.2d 318, 320 (11th Cir. 1992) ("[I]f the state fails to correct the defect within the given time and the prisoner is released from custody, the state may ordinarily still rearrest and reprosecute that person.").

In rare circumstances, a habeas court can end a state criminal proceeding as part of the habeas remedy. If the constitutional problem that led to the grant of the writ cannot be cured by a new trial—for example, if a double jeopardy

violation merits habeas relief—then the habeas court can permanently end the state criminal proceeding. "For a federal court to exercise its habeas corpus power to stop a state criminal proceeding 'special circumstances' must exist. . . . [T]he constitutional violation must be such that it cannot be remedied by another trial, or other exceptional circumstances [must] exist such that the holding of a new trial would be unjust." *Capps*, 13 F.3d at 352-53; *see also Foster v. Lockhart*, 9 F.3d 722, 727 (8th Cir. 1993) ("[Banning a retrial] is an extraordinary remedy that is suitable only in certain situations, such as where a retrial itself would violate the petitioner's constitutional rights.").

Here, a retrial would not violate Jones's constitutional rights. Additionally, there are no other "special circumstances" that justify an order ending all state murder proceedings against Jones in the event that the State cannot begin a retrial within 120 days. Thus, the district court lacked authority to do anything except order Jones's release, which the court may properly condition by giving the State a certain amount of time to retry him. Its order conditionally dismissing the indictment against Jones was an abuse of discretion.

## CONCLUSION

The district court's grant of habeas corpus relief is AFFIRMED. The portion of its order conditionally requiring the State to dismiss the indictment against Jones is VACATED and the case is REMANDED for further proceedings consistent with this opinion.